### DREGER v. MALLARD, Supervisor of Registration of Duval County.

No. 642660-E.

Circuit Court, Duval County.
July 6, 1964.

44

Victor E. Raymos, Jacksonville, for plaintiff.

J. Henry Blount, Jacksonville, for defendant.

ROGER J. WAYBRIGHT, Circuit Judge.

*Final decree:* On May 11, 1964, the board of county commissioners of Duval County adopted a resolution purporting to authorize a "straw ballot" to be taken at the second primary election to be held on May 26, 1964. The occurrence is thus reported in the minutes of that board —

### "STRAW BALLOT" AUTHORIZED
#### CONCERNING RACIAL INTEGRATION OF CERTAIN FACILITIES

Mr. Fitzhugh Powell, representing the Duval County Federation for Constitutional Government, appeared before the Board and read a prepared statement, in substance, urging the Board to authorize a "straw ballot" at the Second Primary Election on the question, "Should privately owned restaurants, hotels and motels be forced to racially integrate their customers?" Mr. Richard L. Milligan, President of the Jacksonville Restaurant Association, appeared before the Board in support of the request. A delegation of interested citizens was present and ready to support the request for a "straw ballot". After further discussion and on motion of Commissioners Stokes and Harris, the Board unanimously resolved to

authorize the "straw ballot" subject to the Duval County Federation for Constitutional Government providing for all election expenses including printing of the ballot, necessary forms and supplies plus the payment of assessment of $7.50 per precinct as administrative cost.

The defendant, as supervisor of registration of Duval County, implemented that resolution by accepting supplies of "straw ballot" forms from the private sponsoring organization mentioned in that resolution, distributing them to those electors who cast absentee votes in advance of the election, and receiving filled-out "straw ballot" forms from those absentee voters. The defendant intended to implement that resolution further by distributing "straw ballot" forms to those electors who voted at the polls on May 26, 1964.

On May 18, 1964, the plaintiff, who is an elector and taxpayer of Duval County, filed a complaint for an injunction against the defendant in his capacity as supervisor of registration of Duval County, praying that the defendant be temporarily and permanently enjoined from taking any action pursuant to that resolution of the board of county commissioners.

Following a lengthy hearing held before the court after due notice, on May 22, 1964, orders were entered that, if the plaintiff posted a $25,000 injunction bond by 4 p.m. on May 25, 1964, a temporary injunction would issue restraining the defendant, during the pendency of this case, from taking any action with reference to conducting the "straw ballot". The plaintiff posted a cash bond with the clerk by the time specified, and the temporary injunction was issued, the day before the second primary election of May 26, 1964.

An answer to the complaint was filed on May 29, 1964, and the final hearing was held before the court on June 26, 1964, at which substantially the same evidence was adduced as had been presented at the earlier hearing.

Traditionally, in cases of this general type, initial attacks are made by the defendant upon the right of the plaintiff to maintain the suit and the jurisdiction of the court to entertain the suit. So it was in this case.

In contesting the right of the plaintiff to maintain this suit, the defendant points out that the plaintiff has alleged and proved only that he is an elector and taxpayer of Duval County. The defendant asserts that the plaintiff cannot maintain a suit like this unless he alleges and proves that the action sought to be enjoined "will result in an increase of his taxes, or will otherwise result in direct or indirect pecuniary injury to him" (Bryan v. City of Miami, 56 So.2d 924, 926 (S.C. Fla., 1951); that the plaintiff must allege and prove an "interest in the plaintiff dif-

ferent from the public generally" (Pirtle v. City of Titusville, 101 So.2d 397, 398 (D.C.A.2,Fla., 1958).

The legal principle relied upon by the defendant in that assertion, and expressed in the two cases above referred to (which were cited by the defendant), has also appeared in various other cases decided by the Supreme Court of Florida, and in cases decided by the appellate courts of other jurisdictions. Adherence to that principle has been spotty, for, as expressed in 17 Fla. Jur., Injunctions, § 54 (1958), "this qualification is not of rigid application". Indeed, a survey of the various Florida decisions, and those of other jurisdictions mentioned in 43 C.J.S., Injunctions, §§ 108-149 (1945), leads to the conclusion that it is not possible to make a logical classification of the circumstances in which a plaintiff must, or need not, have a special status (other than that of elector or taxpayer) in order to sue for an injunction.

In Wester v. Belote, 103 Fla. 976, 138 So. 721, 726 (S. C. Fla., 1931), the Supreme Court flatly said that —

> Citizen and taxpayers, when suing as such, undoubtedly have the right to injunctive relief to protect the public treasury against illegal disbursements of public funds which it is charged will result from the carrying out of an unauthorized or illegal contract. And in such cases *no other showing is required of complainant than that he allege his status as a citizen and taxpayer* and point out that the threatened disbursement of public funds is for an unauthorized or illegal purpose, whether any actual fraud or misconduct was intended or contemplated thereby or not. (Italics added.)

Even in cases in which it is sought to restrain illegal expenditure of public funds, therefore, the principle does not seem always to be cherished that the taxpayer who brings the suit must be in the posture of one who will suffer a special or peculiar injury, different from the public generally, or even of one who will suffer a financial injury.

But the case now before the court, according to the defendant, is not even of the type in which that principle would normally come into play if it should be consistently adhered to, for that doctrine seems to be applicable primarily when it is sought to restrain the illegal expenditure of public funds.

In this case the defendant claims that no public funds were to be expended in the conducting of the "straw ballot", for the reason that the "straw ballot" forms and other necessary materials had been furnished by the sponsoring private organization, and that private organization was to pay $7.50 per precinct to cover the extra expense involved in conducting the "straw ballot".

The defendant agreed that the major expense involved in conducting the "straw ballot" was the expense to which the county

would be put in any event, in conducting the second primary election, and that all the sponsoring private organization was to pay was the extra expense.

Whether it can logically be said that no public funds would be spent to conduct a "straw ballot", when the entire election machinery of the county, exclusive of its voting machines, would be employed in that task, is a question that suggests its own answer, but that need not be formally answered here. An argument undoubtedly can be made, as the defendant makes, that since the county would be put to no extra expense to conduct the "straw ballot", no county funds would be spent for that purpose. An argument can also, and with less tongue-in-cheek overtones, be made that devoting thousands of dollars of county funds to setting up an election apparatus, then permitting that expensive device to be used to conduct a "straw ballot", amounts to spending county funds to conduct a "straw ballot".

Without deciding that point, it is sufficient to say that, according to the defendant, no public funds were to be spent in conducting the "straw ballot", so the principle upon which he relies, that the plaintiff must have some stake in the matter different from the public generally, must be in danger of suffering some pecuniary injury, before he is in position to ask for an injunction, would not usually be considered to be applicable to this case.

This was pointed out by the Supreme Court of Florida, after a fashion, in McGregor v. Burnett, 105 Fla. 447, 141 So. 599 (S. C. Fla., 1932). In that case, a plaintiff who occupied no status other than that of an elector and taxpayer of the county sought to have the county tax collector enjoined from accepting payment of poll taxes by mail rather than from the registrants in person, the plaintiff contending that the governing statute required personal appearance of registrants. The tax collector contended that the plaintiff "does not have such an interest in the result as would entitle him to maintain this suit", "relying on Rickman v. Whitehurst, 73 Fla. 152, 74 So. 205." The Supreme Court, passing squarely on the point, said —

In *Rickman v. Whitehurst,* the complainant sought to restrain the expenditure of certain public funds, and it was there held, that to entitle him to litigate such a suit he must make a showing of peculiar injury to himself as a result of such expenditure.

We do not think *Rickman v. Whitehurst* is in point with the case at bar. In that case the defendants were charged with illegally spending public funds, while in the instant case neither fraud nor illegality is charged, but it is contended that the payment of poll taxes by mail is contrary to the intent and letter of the statute regulating such payments and will result in fraud being perpetrated by those permitted to pay in such manner.

> Fraud not being directly charged, it becomes unnecessary to discuss that question more than to state that, in cases where fraud or other palpable violation of the registration or election laws is charged prior to an election, *any elector* is entitled to his relief by injunction or such other appropriate remedy as is available to him under the law, . . . (Italics added.)

Later in the same year, in State ex rel. Landis v. Tedder, 106 Fla. 140, 143 So. 148, 149 (S. C. Fla., 1932), the Supreme Court said —

> This court is also committed to the doctrine that any and all appropriate judicial writs, including writs of injunction in proper cases, are available to *electors* and office holders to prevent violations of statutes enacted for the purpose of regulating and securing the expression of popular will in elections, when the remedy is seasonably sought by the complaining party and no waiver or estoppel can be applied against him. [Citing case] For limitations on this rule, see *Joughin v. Parks*, Circuit Judge (Fla.), 143 So. 145, opinion filed June 27, 1932. (Italics added.)

The following year, in Joughin v. Parks, 107 Fla. 833, 147 So. 273 (S. C. Fla., 1933), the Supreme Court had occasion to lay down some guidelines as to when an equity court should assume jurisdiction to issue injunctions in cases of this general type, as well as to indicate again who has status to sue for such injunction. Certain complainants "as citizens and electors of Hillsborough County" had sought an injunction against the sheriff and all his deputies, including the inspectors of each of the 73 election precincts in the county, charging a multitude of irregularities and violations of the election laws by them in the first primary election and that such would be continued in the second primary election to be held unless enjoined. The Supreme Court, in disposing of the case, posed to itself the question of "what, if any, jurisdiction, courts of equity have in this state over the administration of primary election laws", and answered the question by saying —

> A political right has reference to those rights exercised by the citizen in the formation, administration, or conduct of the government. In this sphere, political rights take a wide range, whether procured through constitutional, statutory, or use methods. The right to vote or otherwise participate in an election, to be a member of a political party, to be a candidate for and hold office, petition, to execute governmental duties, and to encourage political theories that make for the betterment of the citizen, are among some of the more common political rights. Political rights are distinguished from civil rights on the ground that the latter are those common to every citizen or inhabitant not connected with the organization, administration, or conduct of the government. The right to contract, to own and protect property, to trial by jury, to enter into the marital relation, and other rights that may be redressed in a civil action are enumerated as civil rights.

> In jurisdictions recognizing distinct courts of law and equity like Florida, the rule is well settled that equity is without authority to determine questions involving rights that are purely political, nor will they undertake the protection of such rights by the writ of injunction. [Citing authorities]

This rule recognizes degrees in political rights and applies only where rights purely political are involved. One's right may not be purely political when it has coalesced with a civil or personal right, or has been clothed by the Constitution or statute with a quality superior and beyound the mere exercise of a political or party function. In such cases the question of whether or not a political right has been or is about to be exercised in compliance with law is a judicial question for determination by the courts.

The right to vote, for example, is not inherent. It is secured by law. So long as the security extends only to the naked right to vote it is purely political, but when the law takes it over and throws around it safeguards in the interest of the voter and requires it to be exercised under rules and regulations to safeguard the ballot and the body politic it becomes more than a naked political right and will be protected in like manner as a civil right. A court of equity will in other words not attempt to supervise or control the management of a political party or a political function, but when the law prescribes rules and regulations for the party to conduct an election *any interested elector* may invoke the aid of a court of appropriate equitable remedies to enforce such rules and regulations. [Italics added.]

Generally the jurisdiction of a court of equity, unless enlarged by statute or the Constitution, is limited to the protection of the rights of property or civil rights. [Citing case] To assume jurisdiction to control the exercise of political powers, or to protect purely political rights of the individual, would be an invasion of the function of the common law or the domain of the other departments of government; but we do not consider the exception to this rule here prescribed as such an invasion. [Citing cases]

It is apparent from that holding that "any interested elector" has a right to invoke the jurisdiction of a court of equity to enforce the rules and regulations prescribed by law for the conduct of an election, if that elector can prove that a deliberate violation of the election laws is about to take place, and that a court of equity has jurisdiction to entertain such a suit.

Three years later, in Tacker v. Board of Com'rs of Polk County, 127 Fla. 248, 170 So. 458, 459 (S. C. Fla., 1936), a taxpayer sued to enjoin the county commissioners from printing on the general election ballots the special question of recall of slot machine licensing, contending that the legislative act providing for such a referendum to be held prescribed that it was to be held only if 20 per cent of the qualified electors of a county should petition for it, and that 20 per cent of the qualified electors had not so petitioned.

Holding the plaintiff-taxpayer entitled to sue, the Supreme Court said — "Inasmuch as the result of the question if unlawfully submitted may adversely affect their statutory rights, citizens and taxpayers have an equitable standing to have enforced by injunction the observance of the statutory condition that is precedent to any legal right in the county commissioners to call an election under [the statute]."

The "statutory rights" of citizens and taxpayers that might be adversely affected by unlawful submission of the question to the electors on the ballot were not spelled out in the Supreme Court's opinion in the Tacker case, supra — presumably the court meant their right to continue to play slot machines.

That principle that a court of equity has jurisdiction on proper showing to enjoin "an election held in violation of law or contrary to well-established legal requirements", when there is no other legal remedy, has been echoed in other Florida appellate court decisions. City of DeLand v. Fearington, 108 Fla. 498, 146 So. 573 (S. C. Fla., 1933) ; Dulaney v. City of Miami Beach, 96 So. 2d 550, 552 (D.C.A. 3, Fla., 1957).

This court is, therefore, impelled to conclude that the plaintiff has sufficient status, as an elector and taxpayer, to maintain this suit, and that this court has jurisdiction to entertain the suit and to grant the injunctive relief prayed for if warranted by the facts.

The main question involved in this case is whether the board of county commissioners of Duval County can legally authorize, and whether the defendant as supervisor of registration of Duval County can legally conduct, a "straw ballot".

The subject matter of the question posed by the "straw ballot" is irrelevant. The question is whether any "straw ballot" can legally be conducted under current Florida law, not whether a "straw ballot" posing a particular question can be so conducted.

In 29 C.J.S., Elections, § 66 (1941), it is said that —

In all popular forms of government the power of a majority to bind the minority by a popular vote depends upon the fact that the elections are held by virtue of some legal authority. There is no inherent right or power in the people to hold an election. It must be based on authority conferred by law; and an election held without affirmative constitutional or statutory authority, or contrary to a material provision of the law, is universally recognized as being a nullity.

The authority to hold an election is legislative and political. The legislature may provide for elections, both general and special, so long as they do not conflict with constitutional requirements, and, except in so far as constitutional provision is made for an election, the legislature alone has authority to provide for an election. . . .

And in 18 Am. Jur., Elections, § 100 (1938), the same doctrine is more briefly expressed —

There is no inherent right in the people, whether of the state or of some particular subdivision thereof, to hold an election for any purpose. Such action may be taken only by virtue of some constitutional or statutory enactment which expressly or by direct implication authorizes the par-

ticular election. The rule is firmly established that an election held without authority of law is void, even though it is fairly and honestly conducted.

The defendant candidly agrees that no provision of the Florida election laws authorizes the conducting of a "straw ballot". He willingly concedes that neither Florida Statutes § 100.342 (relating to publishing 30 days' notice of special or referendum elections), Florida Statutes § 101.141 (6) (relating to promulgation by the secretary of state of the form of the ballot), nor any other provision of the election laws was complied with in connection with the "straw ballot" involved in this case.

The view asserted in argument on behalf of the defendant is that the "straw ballot" here involved was not in any sense to be "official", but was to be an extra-legal use of the county's election apparatus to feel the public pulse on a question of public interest, hence did not need to comply with any election law.

Such use of the county's election machinery is, of course, clearly beyond the power of the board of county commissioners to authorize, and beyond the power of the defendant supervisor of registration to carry out.

The Supreme Court of Florida has delineated the scope of the powers of the board of county commissioners of Duval County.

As said in Gessner v. Del-Air Corporation, 154 Fla. 829, 17 So.2d 522 (S. C. Fla., 1944) —

It seems well established by decisions of this court that the county commissioners have only such powers as are granted them by statute, [citing case] may exercise only the authority conferred by statutory regulations, [citing case] and by the constitution itself [citing case]. Moreover, where "there is doubt as to the existence of authority, it should not be assumed". [Citing case]

And in Colen v. Sunhaven Homes, 98 So.2d 501, 503 (S. C. Fla., 1957), the Supreme Court reiterated that —

It is well settled that a county acting through its board of county commissioners is empowered to exercise only such authority as may be delegated to it under the constitution or by statutory grants. [Citing authorities] As such, counties occupy a position analogous to that of municipalities, being limited to, and dependent upon, legislative enactment as the basis of their authority.

It is argued on behalf of the defendant that this long-established law restricting the powers of county commissioners was completely abrogated when, in 1944, § 5 of article VIII of the Florida constitution was amended so as to delete the clause "The powers, duties and compensation of such county commissioners shall be prescribed by law." Citing Peters v. Meeks, 163 So.2d 753, 755 (S. C. Fla., 1964), the defendant professes to read that

case as saying that, since that 1944 amendment, there is no longer any limitation on the power of county commissioners, and they have, "without any express grant, the inherent right to accomplish all objects naturally within the orbit of" county commissioners.

That argument is, of course, untenable. When in Sun Insurance Office v. Clay, 133 So.2d 735, 742 (S. C. Fla., 1961), the Supreme Court quoted a textbook author that " 'It is a fundamental principle of constitutional law that each department of government, whether federal or state "has, without any express grant, the inherent right to accomplish all *objects naturally within the orbit of that department*, not expressly limited by the fact of the existence of a similar power elsewhere or the express limitations in the constitution" ' ", the Supreme Court was deciding a question as to the power of the Supreme Court — one of the three departments of our tripartite form of state government. And when, in Peters v. Meeks, supra, the Supreme Court cited its earlier decision in the Sun Insurance Office v. Clay case, and again used that quotation, the Supreme Court was referring to the powers of the state legislature—another one of the three departments of our tripartite form of state government—not to the powers of county commissioners.

All the Supreme Court decided, in Peters v. Meeks, was that, despite the deletion of the clause from the constitution that "The powers . . . of such county commissioners shall be prescribed by law", the state legislature still had the inherent power to prescribe by law the powers of the county commissioners. The Supreme Court did not decide that the elimination of that clause from the constitution in some magical way transmuted a county commission into a county legislature with inherent—and unlimited—power.

As the Supreme Court pointed out in Sun Insurance Office v. Clay, supra, the state constitution (as distinguished from the federal constitution) is not a grant of power to the state legislature, but a limitation upon the power of the state legislature; except as limited by the state constitution, all legislative power inheres in the people of the state, to be exercised by the people through their state legislature.

A board of county commissioners is not the state legislature, nor is it the county legislature (except, to some extent, in Dade County). A board of county commissioners is not a department of the state government, as the legislature is, but is merely an administrative agency to which the legislature has given certain specific powers with reference to the administration of the affairs of a county, which is merely a political subdivision of the

state. No power, legislative or otherwise, inheres in the board of county commissioners, and that board does not speak for the people in whom the power inheres, for the state constitution makes the legislature the voice of the people to exercise that inherent power. It is the state legislature that is to "enact such laws as will preserve the purity of the ballot" and to pass laws "regulating elections". Florida constitution, art. VI, § 9, and art. III, § 26.

In all likelihood, the Florida legislature could validly enact a statute authorizing the submission to the electors of the state, or possibly even to the electors of a particular county, for an advisory expression of their opinion, questions of public policy such as the one involved herein. It was so held in State ex rel. Fulton v. Zimmerman, 191 Wis. 10, 210 N.W. 381 (S. C. Wis., 1926), with respect to a legislative act authorizing a vote of the Wisconsin electorate as to whether the national congress should amend the "Volstead Act" so as to authorize manufacture and sale of 2.75 per cent beer. And such a procedure for expression of opinion by electors as to whether a city vehicle use tax should be repealed was enacted into law some years ago by the Illinois legislature. See City of Litchfield v. Hart, 306 Ill. App. 621, 29 N.E.2d 678 (App.Ct.Ill., 1940).

However, a contrary view, that even the state legislature could not do so with reference to questions of national interest, was reached by Judge W. May Walker of the circuit court of Leon County, Florida, on September 22, 1950, when, in the case of Free Enterprise Foundation, Inc. v. Robert A. Gray, Secretary of State of Florida, No. 11125, he held unconstitutional an act of the Florida legislature providing for an expression by the electors of Florida as to whether the Florida representatives in the national congress should be directed to urge amendment of the United Nations charter so as to set up a world federal government limited to preventing wars. Judge Walker enjoined the secretary of state of Florida from placing that question on the 1950 general election ballot.

Be that as it may, the state legislature, speaking for the people and exercising the inherent power of the people, has not seen fit to authorize "straw ballots" to be taken on questions of public interest.

That being so, the board of county commissioners may not legally authorize such a "straw ballot" to be taken—on any subject—and the defendant supervisor of registration may not legally conduct such a "straw ballot".

The plaintiff is, therefore, entitled to have the temporary injunction heretofore issued made permanent, to have the "straw ballots" cast by absentee voters destroyed, and to have the in-

54

junction bond posted by him cancelled and the cash deposited as security therefor returned to him.

Accordingly, it is decreed that — (1) The defendant, Robert Mallard, as supervisor of registration of Duval County, is permanently restrained from taking any action with reference to conducting the "straw ballot" authorized by the board of county commissioners of Duval County on May 11, 1964. (2) The defendant shall forthwith destroy all "straw ballots" cast by absentee voters pursuant to the resolution of the board of county commissioners, without counting same or revealing the contents thereof. (3) The clerk of this court shall forthwith return to the plaintiff the $25,000 deposited with the clerk by the plaintiff in connection with the injunction bond referred to in the order of May 25, 1964, entered herein. That injunction bond is cancelled.